NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1617
_____

In Re: DIET DRUGS (PHENTERMINE/FENFLURAMINE/DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

v.

RICHARD FARR,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 99-cv-20593)
(MDL 1203)
District Judge:  Hon. Harvey Bartle, III

_____

Submitted Under Third Circuit LAR 34.1(a)
November 10, 2011

Before:  SCIRICA, SMITH, and JORDAN, *Circuit Judges*.

(Filed November 14, 2011)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Richard Farr appeals the February 2, 2011 order of the United States District Court for the Eastern District of Pennsylvania denying his supplemental claim for Matrix compensation benefits under the Diet Drugs Nationwide Class Action Settlement Agreement (the "Settlement Agreement" or "Agreement"). For the reasons that follow, we will affirm.

## I.  Background

### A.  *The Diet Drugs Class Action Settlement*

This appeal arises out of a claim from the settlement of multi-district products liability litigation regarding the diet drugs Pondimin and Redux, previously sold by American Home Products ("AHP").[1]  *See In re Diet Drugs Prods. Liab. Litig.*, 543 F.3d 179, 181 (3d Cir. 2008).  In November 1999, Wyeth, the successor in interest to AHP, joined plaintiffs' representatives in a Settlement Agreement, which was approved by the District Court in August 2000.  *See id.* at 181.  Under the terms of the Agreement, Wyeth was required to contribute funds for the payment of claims.  *See id.* at 180.  The AHP Settlement Trust (the "Trust"), acting through its trustees and claims administrator, administers and reviews claims to determine the benefits, if any, that a class member is qualified to receive under the terms of the Settlement Agreement.  *See id.*

---

[1] In our prior decisions, we have provided a detailed description of the Diet Drugs litigation.  *See*, *e.g.*, *In re Briscoe*, 448 F.3d 201, 206-08 (3d Cir. 2006); *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 147-48 (3d Cir. 2005); *In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 389-92 (3d Cir. 2004); *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 225-29 (3d Cir. 2002).

B.    *Matrix Compensation Under the Settlement Agreement*

Claimants who qualify for benefits receive compensation based on one of four payment matrices: A-1, A-2, B-1, and B-2 (each, a "Matrix").[2] Each Matrix describes the amount which a claimant is entitled to recover based on the level of severity of the medical condition and the age at which the claimant was first diagnosed as suffering from that level of severity. There are five levels within each Matrix, and the severity of the condition determines a claimant's level within a Matrix. A claimant is eligible for compensation under A-1 unless the claimant has one or more reduction factors as provided in the Settlement Agreement. If a reduction factor exists, benefits are determined by Matrix B-1, which is also referred to as the reduced payment matrix. Two such reduction factors are mitral valve prolapse and chordae tendineae rupture.

To receive Matrix benefits, a claimant must submit a Matrix compensation benefits claim form (a "Green Form") to the Trust. A physician must complete a portion of a Green Form on behalf of the claimant, answering questions concerning the claimant's medical condition and providing the appropriate documentation that may be relevant to determine the amount of compensation payable. Based on both the information in a Green Form and the supporting documentation, the Trust makes a Matrix benefits determination, subject to the audit provisions of the Settlement Agreement.[3] If

---

[2] Two of the matrices, A-2 and B-2, apply only to derivative claimants. Since Farr is not a derivative claimant, matrices A-2 and B-2 are not applicable to the issues raised in this appeal.

[3] Pursuant to § VI.F.2 of the Settlement Agreement, Wyeth has the right to submit to the Trust up to 10% of the claims made during the prior quarter for audit . The Trust

the Trust identifies an inconsistency in the information provided in the Green Form, the Trust reviews the submitted documentation to resolve the inconsistency.

Claimants who received Matrix benefits at one level may make a supplemental claim if their condition worsens to a point which would qualify them for a higher level of compensation. Specifically, § IV.C.3 of the Settlement Agreement provides that a claimant "*can* step up to higher Matrix-Level Conditions and will be paid the incremental dollar amount, *if any*, by which the Matrix payment for the higher Matrix-Level Condition exceeds the Matrix payment previously received." (App. at 355 (emphasis added).)

### C. *Farr's Claims With the Trust*

#### 1. *September 2000 Claim*

Farr filed a Green Form in September 2000 seeking A-1 Level IV benefits (the "September 2000 Claim"), after undergoing mitral valve surgery.[4] Two questions that a Green Form asks, among others, is whether a claimant has "[m]itral valve prolapse" or "[c]hordae tendinae rupture."[5] (App. at 85.) Based on Farr's physician's review of

---

retains a cardiologist to audit such claims. However, in 2002, the District Court found that many claimants were submitting illegitimate claims for Matrix B payments and, thus, ordered the Trust to audit every claim for Matrix B benefits. *See In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2002 WL 32067308, at *6 (E.D. Pa. Nov. 26, 2002); *see also In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 98 (3d Cir. 2006).

[4] Farr had submitted a Green Form in March 2000 indicating moderate mitral regurgitation but reported no condition that would qualify him for any level of Matrix benefits.

[5] Though the Settlement Agreement spells the word "tendineae," the Green Form spells the word "tendinae." Other than when quoting language from the Green Form, we adopt the spelling used in the Settlement Agreement.

Farr's medical reports, Farr's physician marked "no" for both of those questions. However, the medical records attached to the September 2000 Green Form indicated that Farr in fact had "mitral valve prolapse" (App. at 293) and "chordae tendineae [that are] fused and slightly thickened," (App. at 150).

As a result of that discrepancy, Wyeth submitted the September 2000 Green Form to the Trust for audit as to whether Farr's physician made a material misrepresentation when he indicated Farr did not have chordae tendineae rupture. In the initial audit report, the auditing cardiologist wrote that the echocardiogram attached to the September 2000 Green Form "clearly show[ed] ruptured chordae." (App. at 106.) Despite that finding, the auditing cardiologist checked the box which indicated that the physician's answers on the September 2000 Green Form and the medical information reviewed were consistent and reflected a reasonable medical judgment[6] and that Farr qualified for A-1 Severity Level IV benefits. Eleven days later, though, the same auditing cardiologist issued a revised report indicating that the physician's answers on the September 2000 Green Form and the medical information received did *not* reflect a reasonable medical judgment and that Farr only qualified for B-1 Severity Level III benefits.

Nevertheless, the Trust did not pay B-1 Severity Level III benefits to Farr for the September 2000 Claim. A debate arose instead. On July 23, 2001, the Trust's claims administrator, C. Judson Hamlin, wrote a letter to the trustees of the Trust and counsel for Wyeth indicating that the Trust had not dealt fairly with Farr's claim. Specifically,

---

[6] The Trust contends that the auditing cardiologist mistakenly checked off that box.

5

Hamlin expressed concern that a Trust representative might have asked the cardiologist to revisit the original audit report, and that the revised audit report arrived at a different conclusion than it had in the original audit report based on the same evidence.[7] Hamlin concluded that, if the Trust did not award Farr A-1 Level IV benefits, it must reveal to Farr the "two contradictory audit reports so he may properly pursue his remedy in the courts." (App. at 117.) In response, on August 2, 2009, counsel for Wyeth maintained that Wyeth believed Farr was only entitled to B-1 Level III benefits, noting that it would "certainly present Mr. Farr's entire file to the Court for an objective assessment of whether the Claim should be paid on the A or B Matrix." (App. at 111.)

In the end, on August 9, 2001, the Trust issued a final determination letter (the "2001 Final Determination Letter") that appears to reflect a compromise.[8] It awarded Farr A-1 Level II benefits ($473,032) for his September 2000 Claim. In the cover letter attached to the 2001 Final Determination Letter (the "8/9/01 Cover Letter"), Hamlin wrote that "I have briefly discussed with you the impact of the ruptured tendon chordae

_____

[7] In his letter, Hamlin argued that the echocardiogram dated March 8, 2000 that was attached to the March 2000 Green Form did not indicate a ruptured chordae, and that the first indicator of a ruptured chordae appeared in the medical reports attached to the September 2000 Green Form. Accordingly, Hamlin contended that there was no material misrepresentation made on the March 2000 Green Form based on the March 8, 2000 echocardiogram. However, the matter was submitted for audit on April 27, 2001, specifically referring to an echocardiogram dated July 28, 2000 that was attached to the September 2000 Green Form. That reference indicates that the audit report was based on the September 2000 Green Form and its attached medical documentation, not the March 2000 Green Form and its attached medical documentation.

[8] The Trust claims that the decision to pay Farr A-1 Level II benefits was "unilaterally determined" by Hamlin. (Appellee AHP Settlement Trust's Answering Br at 10.)

6

which AHP argued reduced your claim to a [B-1 Severity II] level. In view of all the circumstances this award was the highest I could convince the Trust to reach." (App. at 75.) In the closing sentence of the 8/9/01 Cover Letter, Hamlin wrote: "I also wish to remind you that if your condition worsens or progresses in the future you will be *eligible to apply* for additional compensation beyond the [A-1 Severity II] level." (*Id.* (emphasis added).)

### 2. *Supplemental Claim*

Farr submitted a supplemental Green Form in September 2004 seeking A-1 Level IV benefits (the "Supplemental Claim"), after suffering a stroke related to another mitral valve surgery. The September 2004 Green Form, attested to by a different physician than the September 2000 Green Form, indicated that Farr had mitral valve prolapse, an independent factor reducing a claim to Matrix B. At audit, it was determined that Farr also had chordae tendineae rupture. In April 2006, after various communications with Farr to assist him in completing the September 2004 Green Form as well as to notify him that the Supplemental Claim would likely not result in any additional benefits,[9] the Trust denied Farr the additional benefits he sought pursuant to the Supplemental Claim. It based its conclusion on the September 2004 Green Form answer indicating the presence of mitral valve prolapse as well as the auditing cardiologist's finding of chordae tendineae rupture.

---

[9] All awards under Matrix B-1 would have been less than the A-1 Level II benefits that Farr received as a result of his September 2000 Claim.

7

D.     *Order to Show Cause Proceedings*

After the Trust denied the Supplemental Claim, Farr filed an "Omnibus Motion Regarding Claim of Richard Farr for Matrix A-1 Benefits and Discovery of Fraudulent Tampering of Audit Results" (the "Omnibus Motion").  Upon receiving the Omnibus Motion, the Trust requested that the District Court issue an order affirming the Trust's determination to deny payment for the Supplemental Claim, and the District Court issued an order directing Farr to show cause why the relief requested by the Trust should not be granted.

When the District Court reviewed the record developed in response to the show cause order and the Omnibus Motion, it affirmed the Trust's decision to deny the Supplemental Claim.  First, the Court rejected Farr's argument that, based on the 8/9/01 Cover Letter, the Trust is prohibited, by contract or collateral estoppel, from considering him as warranting only B-1 Matrix benefits.  As to the contract argument, the Court concluded that, even assuming the 8/9/01 Cover Letter created a binding contract, it only stated that Farr would be "eligible *to apply* for additional compensation beyond the [A-1 Severity II] level."  (App. at 10.)  As to the collateral estoppel argument, the Court rejected Farr's position "because the parties did not litigate Farr's alleged entitlement to Matrix A-1 benefits and no court entered a final judgment upon which such a determination of his alleged entitlement was essential."  (App. at 11.)  The District Court next concluded that Farr, in the show cause record, did not meet his burden to prove that there was a reasonable medical basis supporting his claim for A-1 Level IV benefits, because he had conceded the existence of mitral valve prolapse.

8

Farr timely appealed.

## II. Discussion[10]

"We review a District Court's exercise of its equitable authority to administer and implement a class action settlement for abuse of discretion." *In re Diet Drugs Prods. Liab. Litig.*, 543 F.3d at 184 n.10. An abuse of discretion may be found if the District Court's decision "rest[s] on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotation marks and citation omitted).

On appeal, Farr contends that the District Court erred in (1) determining that a contract did not exist to pay him Matrix A-1 benefits for the Supplemental Claim; (2) refusing to compel the Trust to pay Farr's Supplemental Claim because his September 2000 Claim "pass[ed] the original independent audit" (Appellant's Opening Br. at 24); and (3) denying Farr due process by engaging in contract interpretation analysis without "notice … or an opportunity … to respond,"[11] (*Id*. at 29). We disagree with each of those contentions.

### A. *The 8/9/01 Cover Letter Did Not Create a Contract to Pay Matrix A Benefits for the Supplemental Claim*

Farr argues that the District Court erred when it determined that the 8/9/01 Cover Letter did not create an enforceable contract which obligated the Trust to pay him Matrix

---

[10] We exercise jurisdiction over a final order of the District Court pursuant to 28 U.S.C. § 1291.

[11] Farr does not challenge the District Court's determination that he failed to meet his burden of showing a reasonable medical basis for his assertion that he is entitled to A-1 Level IV benefits. Therefore, we will not address that issue on appeal.

9

A benefits for the Supplemental Claim. To form a contract, there must be an offer, acceptance, and consideration. *Yarnall v. Almy*, 703 A.2d 535, 538 (Pa. Super. Ct. 1997). With regard to contract interpretation, "[w]here [the] language [of a contract] is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92-93 (3d Cir. 2001) (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)).

We agree with the District Court that the 8/9/01 Cover Letter did not create a contract that obligated the Trust to pay Farr Matrix A-1 benefits on the Supplemental Claim. Even if the 8/9/01 Cover Letter could be construed as an offer which Farr accepted by not challenging the 2001 Final Determination Letter, and even if it was supported by adequate consideration when Farr accepted the A-1 Level II payment, the award received in connection with the 8/9/01 Cover Letter only applied to the September 2000 Claim, which related to Farr's mitral valve surgery in 2000. The 8/9/01 Cover Letter did not apply to the Supplemental Claim, which related to a stroke Farr suffered after undergoing a separate mitral valve surgery in 2004. In fact, the 8/9/01 Cover Letter was clear and unambiguous when it stated that Farr would only be *"eligible to apply* for additional compensation beyond the [A-1 Severity II] level" if his condition deteriorated.[12] (App. at 75 (emphasis added).) Assuming there was a contract, applying

_____

[12] The contents of the 8/9/01 Cover Letter that address Farr's eligibility to apply for supplemental benefits comport with § IV.C.3 of the Settlement Agreement, which states that a claimant "*can* step up to higher Matrix-Level Conditions and will be paid the incremental dollar amount, *if any*, by which the Matrix payment for the higher Matrix-Level Condition exceeds the Matrix payment previously received." (App. at 355. (emphasis added).) Section IV.B.2.d.(2)(c)(ii) of the Settlement Agreement provides that

10

its terms as manifestly expressed, the District Court correctly concluded that, "at best," the 8/9/01 Cover Letter provided Farr with only "the right to apply for supplemental Matrix Benefits." (App. at 11.)

B.    *The Initial Audit Report Does Not Entitle Farr to A-1 Level IV Benefits*

Farr contends that, even if the 8/9/01 Cover Letter does not create a contract to pay him Matrix A-1 benefits on the Supplemental Claim, he should still be awarded A-1 Level IV benefits based on the results of the initial audit of the September 2000 Green Form. But, contrary to his argument, the record reveals that Farr did not "pass[] [an] original independent audit" awarding him A-1 Level IV benefits. (Appellant's Opening Br. at 24.) Rather, the results of that initial audit "clearly show[ed] ruptured chordae," (App. at 106) an independent factor reducing his claim to Matrix B-1. Though the auditing cardiologist at first marked that Farr qualified for Matrix A-1 benefits and that his physician's answers on the September 2000 Green Form and the medical information reviewed reflected a reasonable medical judgment, that marking was contradicted by the auditing cardiologist's own comments on the audit form indicating the presence of ruptured chordae. Moreover, that initial audit report was subsequently revised to say that Farr's physician's answers and the medical information received did not reflect a

---

both mitral valve prolapse and chordae tendineae rupture are independent factors that reduce a claim to Matrix B. Thus, to construe the 8/9/01 Cover Letter in a way that would pay Farr Matrix A benefits on all future claims would violate the terms of the Settlement Agreement.

11

reasonable medical judgment and that Farr only qualified for B-1 Severity Level III

benefits.[13]

Additionally, the audit of the September 2000 Claim, for which Farr accepted A-1

Level II benefits, was not related to the Supplemental Claim. A separate audit was

performed on the Supplemental Claim, which determined that Farr had chordae tendineae

rupture.[14] Moreover, Farr's physician admitted the presence of mitral valve prolapse in

---

[13] In his brief, Farr makes much of the fact that Wyeth allegedly sent his September 2000 Green Form to audit to determine whether there was a material misrepresentation as opposed to sending it to audit to determine whether there was a reasonable medical basis to support his physician's opinions. Since Farr claims that he "pass[ed] the original independent audit," (Appellant's Opening Br. at 24) he says that we "should not relieve[] Wyeth from the consequences of its decision," (*Id*. at 26). Farr acknowledges that if Wyeth decided to submit his claim to audit to determine whether there was a reasonable medical basis, the claim "would have resulted in a slam dunk denial of Matrix A benefits." (*Id*. at 27.) On both the initial and corrected audit report of the September 2000 Green Form, the auditing cardiologist found ruptured chordae, which evinced a material misrepresentation on the September 2000 Green Form and also proved that there was no reasonable medical basis to support a claim for Matrix A-1 benefits. Moreover, on the corrected audit report for the September 2000 Green Form, the cardiologist specifically marked that the answers and the medical information received from the September 2000 Green Form did not reflect a reasonable medical judgment. Thus, whether it was sent to audit based on a material misrepresentation or an unreasonable medical basis, Farr cannot claim that the initial audit report for the September 2000 Green Form entitles him to A-1 benefits for the Supplemental Claim.

[14] The September 2004 Green Form did not indicate that Farr had chordae tendineae rupture. After the September 2004 Green Form was completed, it was sent to audit. Because Farr admitted the presence of mitral valve prolapse, the Trust argues that there was no reason to audit that issue. During the audit, the auditing cardiologist initially marked "yes" to the box asking whether there was a reasonable medical basis for the physician's answer that there was no chordae tendineae rupture, writing that "no chordae rupture is seen," but also noted the existence of mitral valve prolapse. (App. at 81.) The Trust inquired whether the auditing cardiologist had been provided with the echocardiogram attached to the September 2000 Green Form. After reviewing that echocardiogram, the auditing cardiologist revised the audit report to mark "no" to the box asking whether there was a reasonable medical basis for the physician's answer that there

the September 2004 Green Form, another independent factor reducing his Supplemental Claim to Matrix B-1. We agree with the District Court that "even if the Trust erroneously agreed to pay Matrix A-1 benefits based on the initial [i.e., the September 2000] claim, we will not allow the explicit provisions of the Settlement Agreement to be ignored where an undisputed reduction factor exists." (App. at 12.)

C. *Farr's Due Process Rights Were Not Violated*

Finally, Farr claims that the District Court denied him due process "when it engaged in contract interpretation analysis, *sua sponte*, and made a decision without providing any notice to Farr or an opportunity to Farr to respond to its arguments and conclusions." (Appellant's Opening Br. at 29.) That claim is meritless. Farr was given notice and an opportunity to challenge the Trust's denial of the Supplemental Claim through the show cause proceedings. In papers that he submitted as part of those proceedings, Farr repeatedly insisted that he had a contract claim, going so far as to say that "the dispute in this matter involves a contract dispute and not a dispute about Farr's medical condition." (App. at 267.) Therefore, Farr should not have been surprised that

was no chordae tendineae rupture, and wrote "the surgical operative note states clearly that at the time of direct evaluation of the mitral valve there was [sic] multiple ruptured chordae identified." (App. at 81.) In any event, it does not matter whether it was proper for the Trust to consider the chordae tendineae rupture as a basis for denying the Supplemental Claim because the existence of mitral valve prolapse, as admitted by Farr, is an independent factor that reduces a claim to Matrix B-1. Since all awards under Matrix B-1 were less than the A-1 Level II benefits that Farr received as a result of the September 2000 Claim, the existence of mitral valve prolapse prevents Farr from receiving the additional benefits that he sought in his Supplemental Claim.

the District Court engaged in contract interpretation, and there was no denial of due process.

## III.    Conclusion

For the foregoing reasons, we will affirm.